922 P.2d 901 (1996)
THANE NEIGHBORHOOD ASSOCIATION, Alaskans for Juneau, Appellants,
v.
CITY AND BOROUGH OF JUNEAU, Appellee, and
Echo Bay Alaska, Inc., Intervenor-Appellee.
No. S-6710.
Supreme Court of Alaska.
September 6, 1996.
*902 Eric Smith, Anchorage, for Appellants.
John R. Corso, City & Borough Attorney, Juneau, for Appellee City & Borough of Juneau.
James F. Clark, Terry L. Thurbon, Robertson, Monagle & Eastaugh, Juneau, for Intervenor-Appellee Echo Bay Alaska.
Before COMPTON, C.J., RABINOWITZ, MATTHEWS and EASTAUGH, JJ., and CARPENETI, J., Pro Tem.[*]

OPINION
MATTHEWS, Justice.
Echo Bay Alaska, Inc., applied to the City and Borough of Juneau in November 1990 for a large mine permit for the AJ Mine. The proposed mine is located four miles from downtown Juneau. The tailings that will result from the processed ore are to be pumped into a tailings pond created by constructing a *903 dam in Sheep Creek Valley. The proposed dam will be 332 feet high and 750 feet long. If the mine goes into production 100 million tons of tailings are expected to be produced and pumped into the pond. The excess water from the tailings pond will be discharged into Gastineau Channel. The discharge from the tailings pond to the channel could be as great as 250 cubic feet per second.
The City and Borough of Juneau Planning Commission (Commission) approved the application in a notice of decision issued on May 14, 1993. The approval was subject to a set of conditions. The permit was to be issued after a financial warranty was paid and after Echo Bay agreed to the conditions and signed a mitigation agreement. Approval of the tailings dam and impoundment and the discharge of wastewater was withheld until additional information was provided.
Appellants, Thane Neighborhood Association (TNA) and Alaskans for Juneau (AFJ), appealed the Commission's decision to the City and Borough of Juneau Assembly (CBJ) on June 7, 1993. Echo Bay was granted permission to participate as a party. The CBJ heard oral argument on August 30, 1993, and issued a decision denying the appeal on September 22, 1993. TNA and AFJ then appealed to the superior court and Echo Bay was permitted to intervene. On October 26, 1994, the superior court affirmed the decision of the CBJ. In this appeal, the appellants argue that the "CBJ impermissibly used a `phased' approach in approving" the permit and that the CBJ's finding that issuance of the permit complied with standards set forth in the CBJ mining ordinance is not supported by substantial evidence. In December 1995 CBJ and Echo Bay filed a supplemental brief, and TNA and AFJ filed a response addressing the issue of whether the "Planning Commission [could] assure future compliance with the substantive standards for mining operations ... by imposing permit conditions requiring future performance rather than by demanding pre-application-approval demonstration of future ability to comply."

THE CODE
The review of large mine permits is governed by the Code of the City and Borough of Juneau (CC & BJ) 49.65 (1989). CC & BJ 49.65.110 provides in part: "It is the purpose of this article to foster the development of a safe, healthy and environmentally sound mining industry while protecting the overall interests of public health, safety and the general welfare and minimizing the environmental and surface effects of mining projects for which an exploration notice or mining permit is required."
The procedure for obtaining a large mine permit is governed by CC & BJ 49.65.130. CC & BJ 49.65.130(b) requires an application for a large mine permit to
be submitted in the form of a report containing sufficient information so that the department can, after reviewing the application, evaluate, in accordance with the standards of subsection 49.65.135(a), the impacts[[1]] described in this subsection that the mining operation may have on the city and borough. The application shall contain a map on a scale of 1:63,360 or a more detailed scale, a description of the mine site and affected surface; a description and timetable of the proposed mining operation, including all roads, buildings, processing and related facilities; a description and timetable of proposed reclamation of affected surface; a description of proposals for the sealing of open shafts, adits and tunnels upon the completion or temporary cessation of mining operations; a description of methods to be used to control, treat, transport and dispose of hazardous substances, sewage and solid waste; and a description of other potential environmental, health, safety and general welfare impacts, as well as neighboring property impacts and measures to be taken to mitigate their adverse effects. The application shall also contain additional information normally prepared by the operator for its feasibility studies and mining plans, including information establishing the right to use the affected surface, labor force characteristics *904 and timing, payroll projections, anticipated duration of the mining operation, construction schedules, infrastructure description, and other information reasonably requested by the department in the preapplication conference held pursuant to Section 49.15.330(b)....
(Emphasis added.) Likewise, CC & BJ 49.15.130(b), which governs applications for land use permits in general, provides that "[a]n application is complete when it contains all of the information necessary to determine if the development will comply with all of the requirements of the permit applied for."
CC & BJ 49.65.130(f) requires the Community Development Department (Department) to conduct an application review, which
shall include, but not be limited to, the following determinations: whether air and water quality will be maintained in accordance with federal, state, and city and borough laws, rules and regulations; where sewage, solid waste, hazardous and toxic materials will be properly contained and disposed of in accordance with federal, state, and city and borough laws, rules and regulations; the extent to which the operator will agree to mitigate adverse impacts on the city and borough; whether the mining operation will be conducted in such a way as to minimize safety hazards to the extent reasonably practicable and will mitigate adverse impacts on the public and on neighboring properties such as those from traffic overloading, noise, dust, unsightly visual aspects, surface subsidence, avalanches, landslides and erosion; and whether appropriate historic sites will be protected.[[2]]
CC & BJ 49.65.130(f) further provides:
The department shall form a recommendation as to whether the permit should be approved.... The department's recommendation may include such conditions or stipulations as the department deems to be reasonably necessary to mitigate any adverse environmental, health, safety, or general welfare impacts which may result from the proposed mining operation.... If the [planning] commission determines that the application, with stipulations or conditions[[3]] as appropriate, satisfies the standards of Sections 49.65.135 and 49.15.330, it shall approve the application....
The primary requirements for a large mine permit are contained in CC & BJ 49.65.135 (1989), which states:
STANDARDS FOR ISSUANCE OF PERMITS AND CONDUCT OF OPERATIONS. (a) In determining whether to recommend issuance of a permit, the [community development] department shall require that:
(1) The mining operations be conducted in accordance with this article, Section 49.15.330,[[4]] and any other applicable provisions of the city and borough code in such a way as to mitigate adverse environmental, health, safety and general welfare impacts;
(2) Air and water quality be maintained in accordance with federal, state, and city and borough laws, rules and regulations;
(3) Hazardous and toxic materials, sewage, and solid waste be properly contained and disposed of in accordance with applicable federal, state, and city and borough laws, rules and regulations;
(4) The operator conduct all mining operations according to the standards of the city and borough as contained in this article, Section 49.15.330, the permit, and any other applicable provisions of the city and borough code, so as to minimize to the extent reasonably practicable safety hazards and to control and mitigate adverse impacts on the public and neighboring properties, such as from traffic overloading, noise, dust, unsightly visual aspects, *905 surface subsidence, avalanches, landslides and erosion;
(5) Appropriate historic sites designated as significant by the city and borough be protected;
(6) Reclamation of the affected surface be in accordance with the approved reclamation plan of the operator; and
(7) With respect to a large mine permit application, the operator negotiate and enter into a mitigation agreement with the city and borough....
....
(b) Reclamation of all affected surfaces shall be completed as soon as is reasonable after affected surface areas are no longer being used in exploration and mining operations. Reclamation shall include the following: cleanup and disposal of dangerous, hazardous or toxic materials; regrading of steep slopes of unconsolidated material to create a stable slope; backfilling underground shafts and tunnels to the extent appropriate; adequate pillaring or other support to prevent subsidence or sloughing; plugging, or sealing of abandoned shafts, tunnels, adits or other openings; adequate steps to control or avoid soil erosion or wind erosion; control of water runoff; revegetation of tailings and affected surface areas with plant materials that are capable of self-regeneration without continued dependence on irrigation and equipment where appropriate; rehabilitation of fisheries and wildlife habitat; and any other conditions imposed by the commission. Subsequent to the issuance of a permit or the grant of authority under an exploration notice, the operator's compliance shall be measured against the requirements contained in that permit or the conditions of the exploration notice and the operator's plans submitted with the permit application or the notice.

THE LARGE MINE PERMIT
After making its determination, the Commission issued a notice of decision, granting approval for the application for a large mine permit subject to a set of conditions. The notice of decision lists the six requirements that are applicable to all conditional use permits as set forth at CC & BJ 49.15.330 and the twenty-one requirements set forth in the mining ordinance (CC & BJ 49.65.100-195), and states its findings for each of these requirements.
TNA and AFJ argue that the findings and conditions in the notice of decision evidence a lack of compliance with the code. They argue that the CBJ used a "`phased' approach in approving the large mine permit." They point to three ways in which they believe the CBJ engaged in phasing. First, the Commission withheld approval of the dam, the tailings pond and marine water discharges until further information was provided, yet granted the permit for the remainder of the project. Second, the Commission approved the permit, yet required Echo Bay to provide further information on certain matters. Third, the Commission imposed as a condition that Echo Bay obtain necessary permits from other agencies.
Echo Bay and CBJ argue that this phasing is consistent with the code. CBJ argues "[t]he purpose of the mining ordinance and the Commission is to grant permits, not to deny them." CBJ and Echo Bay argue that "the CBJ mining ordinance does not vest the commission with discretion to disapprove a large mine permit application when the standards for permit issuance have been met," relying on CC & BJ 49.65.130(f), which states that "if the commission determines that the application, with stipulations or conditions as appropriate, satisfies the standards of Sections 49.65.135 and 49.15.330, it shall approve the application." (Emphasis added.)
CBJ and Echo Bay also contend that the mining ordinance can be satisfied by including permit conditions which incorporate the requirements of the ordinance  it is not necessary to determine in advance whether the plans submitted in the permit application will satisfy those requirements. CBJ argues that the purpose of the ordinance "is to mandate compliance not predict it."

DISCUSSION
This court must determine to what extent the City and Borough of Juneau's code allows phasing when evaluating large mine permit applications. This is a question *906 of statutory interpretation which does not involve agency expertise. Thus, this court will use its independent judgment. See Marlow v. Municipality of Anchorage, 889 P.2d 599, 602 n. 1 (Alaska 1995) (reviewing zoning commission's and board's constructions of zoning ordinance under independent judgment standard, as issues presented were "pure questions of statutory construction which d[id] not involve agency expertise").

A. Did the Commission Err by Granting a Large Mine Permit Which Excluded the Tailings Dam and Impoundment and Wastewater Discharge?

In this case, CC & BJ 49.65.135(a)(2) requires that "water quality be maintained in accordance with federal, state, and city and borough laws, rules and regulations." In its findings concerning the AJ Mine, the Commission stated that it could not "conclusively determine at this time with current information that the proposed treatment system will maintain water quality in accordance with federal, state and local laws, rules and regulations." The Commission further found that "[t]he available data shows that the federal limit for total suspended solids (TSS) will not be met by the marine water discharge." CC & BJ 49.65.135(a)(4) provides that a mine operator must "conduct all mining operations ... so as to minimize to the extent reasonably practicable safety hazards." The staff had various concerns about the safety of the AJ Mine's proposed tailings dam.
The Commission responded to these problems by withholding approval of the tailings dam and impoundment and the marine wastewater discharge components of the project. The Commission decided that it would determine whether to approve the tailings dam and impoundment and the marine wastewater discharge after the receipt of further information.
While the Juneau code does have provisions allowing the Commission to put conditions on a permit, see CC & BJ 49.15.330(g), 49.65.130(f), there is nothing in the code to support granting the permit for a project as a whole, while excepting one part of a project. Past decisions of this court make clear that phasing a project by permitting it in stages is disfavored.
Three of our recent cases provide considerable guidance as to what sorts of permit approval "phasing" techniques are appropriate and what kinds are not: Trustees for Alaska v. Gorsuch, 835 P.2d 1239 (Alaska 1992); Trustees for Alaska v. State, Department of Natural Resources, 851 P.2d 1340 (Alaska 1993); and Kuitsarak Corp. v. Swope, 870 P.2d 387 (Alaska 1994). In Gorsuch, we held that in granting mining permits, "[Department of Natural Resources (DNR)] may not ignore cumulative effects of mining and related support facilities ... by permitting facilities separately." 835 P.2d at 1246. We ruled that when DNR reviews a mining permit application, it must "consider the probable cumulative impact of all anticipated activities which will be a part of a `surface coal mining operation,' whether or not the activities are part of the permit under review." Id. "If DNR determines that the cumulative impact is problematic," we stated, "the problems must be resolved before the initial permit is approved." Id.
We explained that "[t]his type of `concept approval' is necessary to avoid a situation where, because of industry investment and reliance upon a past mining permit approval, DNR might feel compelled to approve a subsequent permit for a related but environmentally unsound facility." Id. at 1246 n. 6. We added that "[i]n some cases, this may require concurrent, as opposed to serial, review of separate, related permit applications," while "[i]n other cases, anticipated problems resulting from cumulative impacts may require that approval of an initial permit be conditioned upon satisfactory resolution of the problems anticipated in subsequent permits." Id.
This court split in Gorsuch on whether an access/haul road for the mining operation could be permitted under a separate mining permit. The majority determined that a specific regulation implied that separate permitting was allowed and that cumulative impacts could be adequately considered under separate permitting in that instance. Id. at 1245-46. Justice Rabinowitz, joined by Justice Matthews, dissented, arguing that the applicable *907 regulations prohibited separate permitting, and that a single permit was necessary to ensure that the cumulative effects of the mining operation would be adequately considered. Id. at 1250-51.
Justice Rabinowitz contended that "[c]ourts have disallowed segmentation of a proposed project ... to assure that the cumulative effects of the project are adequately considered...." Id. at 1251. Justice Rabinowitz cited Thomas v. Peterson, 753 F.2d 754, 760 (9th Cir.1985), for the proposition that "allowing consideration of cumulative impacts after a portion of [a] project is already approved" swings the balance in favor of project approval even if the project would have been disapproved had all components of the project been considered in the initial permit application. Gorsuch, 835 P.2d at 1251.
In Trustees for Alaska v. State, Department of Natural Resources, 851 P.2d 1340, 1341 (Alaska 1993) (Camden Bay II), DNR's approval of a sale of oil and gas leases was challenged. A regulation required DNR to identify known geophysical hazard areas, and prohibited approval of development in such areas until measures to minimize geophysical hazards were provided. Id. at 1343. DNR identified the entire sale area as a geophysical hazard area. Id. DNR intended to consider particular geophysical hazards on a lease-site-by-lease-site basis, requiring lessees to submit plans to mitigate potential geophysical hazards before approval to develop a specific lease site would be given. Id. at 1343-44 & n. 7.
We disapproved DNR's approach. We held that DNR was required to identify known or substantially possible hazard areas before approving the lease sale as a whole. Id. at 1344-45. We explained that "deferring a careful and detailed look at particularized geophysical hazards to later stages of the development process ... entails certain practical risks." Id. at 1344. Such deferral "may tend to mask appreciation of any cumulative environmental threat that would otherwise be apparent if DNR began with a detailed and comprehensive identification of [the] hazards." Id. We again noted that "the more segmented an assessment of environmental hazards [is], the greater the risk that prior permits will compel DNR to approve later, environmentally unsound permits." Id.
Another regulation at issue in Camden Bay II required DNR to identify important historic sites. Id. at 1345. DNR purportedly attempted to comply with this regulation by requiring the lessees to report on such sites and to try to preserve such sites, arguing that the regulation did not state when historic sites had to be identified. Id. at 1345 & n. 9. We held that DNR had not complied with the regulation, and that DNR was required to identify known historic sites before approving the initial sale. Id. at 1346. We explained that evaluation of historic sites on a lease-site-by-lease-site basis ran "the risk of undervaluing the cumulative cultural significance of the region as a whole," and that the lessees would have an incentive to underreport historic sites. Id. We added that our holding that the regulation at issue required identification of historic sites before approval of the initial sale did "not mean that more intensive duties are not required by this regulation at later stages of development." Id.
We also ruled in Camden Bay II, however, that DNR did not have to examine transportation routes and utility sites before approving the initial sale because "[u]ntil exploration is proposed and, in all likelihood, until and unless a commercially exploitable discovery is made, there will be no occasion for siting, designing or constructing transportation and utility routes." Id. We further decided that DNR was not required "to evaluate the effectiveness of [environmental harm mitigation] measures before even receiving detailed development proposals," since DNR would not be able to assess "detailed mitigation measures even before knowing which activities it needs to mitigate." Id. at 1347.
In Kuitsarak Corp. v. Swope, 870 P.2d 387 (Alaska 1994), DNR approved offshore prospecting permits in a region without conducting an in-depth analysis of the effects of mining in the region. Id. at 391 n. 13, 394 & n. 21. DNR contended that it lacked sufficient information to conduct such an analysis and that it would be easier to do the analysis *908 when specific mining activities were performed. Id. at 391 n. 13, 394 n. 21. We rejected this procedure. We found that DNR had not adequately considered the potential and cumulative impacts of mining in the region. Id. at 395-96.
We noted that DNR's argument that it was difficult to obtain the information necessary to perform a proper evaluation of the impacts of mining in the region was undermined by evidence of federal studies similar to the studies which DNR needed to do. Id. at 396. We stated that "[o]nce the initial impact of mining on the region has been assessed, any unforeseen occurrences or conditions that are revealed during exploration can be dealt with by DNR through use of stipulations and conditions imposed on mining." Id. (emphasis added). We disapproved of DNR's use of conditions to require the development of plans to minimize potential dangers as a substitute for a complete analysis of the potential dangers. See id. at 396 n. 27.
We can draw three general, guiding principles concerning when and in what manner "phasing" or "segmentation" is permissible from Gorsuch, Camden Bay II, and Kuitsarak. First, unless a specific statute or regulation allows phasing, phasing is disfavored. Compare Gorsuch, 835 P.2d at 1245-46 (regulation interpreted as permitting phasing) with Gorsuch, 835 P.2d at 1250-51 (Rabinowitz, J., dissenting) (regulation interpreted as prohibiting phasing). Where a statute is silent or ambiguous, phasing should generally not be allowed. See Camden Bay II, 851 P.2d at 1345-46 (regulation silent on when historic sites must be identified, but best interpreted as requiring identification of known sites at initial permitting stage).
Second, phasing is prohibited if it can result in disregard of the cumulative potential environmental impacts of a project. See Kuitsarak, 870 P.2d at 396 n. 30; Camden Bay II, 851 P.2d at 1344, 1346; Gorsuch, 835 P.2d at 1246. The more interlinked the components of a project are and the greater the danger that phasing will lead to insufficient consideration of cumulative impacts, the greater the need to bar phasing. Compare Gorsuch, 835 P.2d at 1245-46 (separate permitting permissible so long as DNR determines that cumulative impacts will not be problematic) with Gorsuch, 835 P.2d at 1250-51 (Rabinowitz, J., dissenting) (unified permitting process necessary to ensure adequate consideration of cumulative effects).
Third, conditions and stipulations may be used to address unforeseen occurrences or unforeseen situations that may arise during exploration or development, but permit conditions may not serve as a substitute for an initial pre-permitting analysis that can be conducted with reasonably obtainable information. See Kuitsarak, 870 P.2d at 395-96 & n. 27 (approving possible use of conditions to deal with unforeseen events but disapproving use of conditions as substitute for feasible, complete analysis).
Thus, phasing through the use of conditions is prohibited where it is feasible to obtain the information necessary to determine whether environmental standards will be satisfied before granting an initial permit, but allowed where it is impractical or impossible to create detailed development plans without conducting additional physical exploration. See Camden Bay II, 851 P.2d at 1343-47 (geophysical hazards and historic sites can be investigated during initial permitting stage but transportation routes and mitigation measures cannot be analyzed without further exploration and planning).
Based on these principles the Commission should not have granted the AJ Mine permit while excepting major portions of the project. The tailings dam and impoundment and the marine wastewater discharge system are integral components of the mining project; they are significantly interlinked to other parts of the project. If extensive redesigns to these components become necessary, the mining project could have a significantly greater environmental impact. Phasing the approval of those components could therefore cause the cumulative impacts of the mining project to be inadequately considered.
After the Commission granted Echo Bay the large mine permit for the project as a whole, the United States Environmental Protection Agency (EPA) disapproved the proposal *909 for the dam at Sheep Creek, and Echo Bay abandoned the plan to build the dam there. The EPA's action will undoubtedly force major redesigns in the mine project. This sequence of events illustrates the dangers of CBJ's improper use of phasing  the initial approval for most components of the AJ Mine may cause CBJ to fail to take into account the cumulative impacts of the redesigns made necessary by the change in the location of the tailings dam.
For these reasons we conclude that the Commission erred in granting permit approval of the project while deferring consideration of important portions of the project.

B. Did the Commission Err by Granting the Permit, Yet Imposing as a Condition that Echo Bay Provide Further Information?

As noted, the Commission found that it could "not conclusively determine at this time with current information that the proposed treatment system will maintain water quality in accordance with federal, state and local laws, rules and regulations." In addition, the Commission found that "[t]he available data shows that the federal limit for total suspended solids (TSS) will not be met by the marine water discharge." In addition to withholding approval of a portion of the project, the second way the Commission responded to this problem was to place conditions into the permit requiring the project "to comply with federal and state water quality standards." The Commission should not have granted the AJ mine permit without knowing whether the plan that was submitted to it would satisfy water quality standards.
The ordinance requires that an application contain enough information for the Department and the Commission to make determinations as to impacts and compliance. First, CC & BJ 49.65.130(f) requires the Department to conduct an application review, form a recommendation and provide the recommendation to the Commission. CC & BJ 49.65.130(b) provides that the application must contain "sufficient information so that the Department can, after reviewing the application, evaluate, in accordance with the standards of subsection 49.65.135(a), the impacts described in this subsection that the mining operation may have on the city and borough." That subsection includes "a description of other potential environmental, health, safety and general welfare impacts." Subsection 49.65.135(a)(2) provides that "[a]ir and water quality be maintained in accordance with federal, state, and city and borough laws, rules and regulations." Second, after the Department provides the recommendation, the Commission must determine whether the "application, with stipulations or conditions as appropriate satisfies the standards of Sections 49.65.135 and 49.15.330." CC & BJ 49.65.130(f). CC & BJ 49.65.330(e)(1)(B) in turn provides that the Commission shall determine whether the application is complete. CC & BJ 49.15.130(b) provides that "[a]n application is complete when it contains all of the information necessary to determine if the development will comply with all of the requirements of the permit applied for." Thus the ordinance requires that (1) the application contain sufficient information for the Department to determine the environmental impacts of the mining operation; and (2) the Commission determine whether the application contains the information necessary to determine whether it will comply with water quality rules and regulations. The Commission's statement that it did not have enough information to determine whether the system would adhere to water quality standards makes it clear that the application failed to meet either of these requirements. Without this information, the Department lacked sufficient information to determine the environmental impacts of the project. In addition, without this information the Commission could not have determined that the application was complete.
This interpretation of the code is further supported by Kuitsarak, 870 P.2d at 394-96. In Kuitsarak, DNR did not gather necessary information regarding environmental impacts before granting an offshore prospecting permit. Id. Similarly, in this case, further information on water quality was necessary before the Commission could grant the mining *910 permit, or even consider the application complete.[5]

CONCLUSION
The Juneau Planning Commission engaged in impermissible phasing in its approval of the AJ Mine permit. The Commission deferred approval of components of the mine which are interlinked with other components, creating an unacceptable danger that cumulative impacts would not be sufficiently analyzed. The Commission utilized conditions as a substitute for evaluations that could have been conducted with feasibly obtainable information.
The Commission reacted by placing conditions on the permits and deferring approval of mine components when it was faced with data that the proposed mine projects would not comply with Juneau code requirements or when it did not have sufficient information to determine whether the requirements would be met. If allowed to use such phasing in response to defects in mining applications, the Commission could grant approval to any permit application no matter how deficient it is, making the Juneau code virtually meaningless and Commission decisions effectively unreviewable.
For these reasons, we REVERSE the decision of the superior court and REMAND this case to the court with directions to vacate the decisions of the Juneau Assembly and of the Commission granting the mine permits, and to REMAND to the Commission for further proceedings in accordance with this opinion.[6]
NOTES
[*] Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.
[1] CC & BJ 49.80.120 defines "impact" as used in CC & BJ 49.65 as "the reasonably foreseeable effects or consequences of a mining operation."
[2] These required determinations track the "standards for issuance of permits and conduct of operations" put forth in CC & BJ 49.65.135.
[3] CC & BJ 49.15.330(g) allows the Commission to place seventeen kinds of enumerated conditions, as well as "other conditions as may be reasonably necessary," on a conditional use permit.
[4] CC & BJ 49.15.330 contains the general standards for obtaining a conditional use permit in Juneau.
[5] AFJ and TNA argue that "an applicant simply cannot demonstrate compliance with all applicable requirements unless it first has obtained the necessary permits from other agencies." The code does not necessarily require this level of demonstration of compliance, but at the very least, the application must contain the "information necessary to determine" whether the project will comply. CC & BJ 49.15.130(b).
[6] The issues regarding the existence or lack of substantial evidence to support various CBJ findings are mooted by our decision.