**KACHEMAK BAY WATCH, INC., an Alaska non-profit corporation, Appellant,**

v.

**Harry A. NOAH, Commissioner, Alaska Department of Natural Resources, Appellee.**

No. S–7326.

Supreme Court of Alaska.

April 11, 1997.

---

1. Because we affirm the APUC's decision, we do not need to consider Summit's cross-appeal in this matter.

Thomas E. Meacham, Anchorage, for Appellant.

Robert C. Nauheim, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH and FABE, JJ.

*OPINION*

RABINOWITZ, Justice.

## I. *INTRODUCTION*

In this appeal Kachemak Bay Watch, Inc. (KBW) seeks to invalidate the decision of the Department of Natural Resources (DNR) to accept applications for aquatic farming in Southeast and Southcentral Alaska. KBW also asks this court to hold that DNR's regulations setting forth criteria for issuing aquatic farmsite permits are legally insufficient and, contrary to the superior court's ruling, that KBW is a public interest litigant. We reverse DNR's decision to accept applications for aquatic farming in Southeast and Southcentral Alaska on the ground that DNR failed to first identify districts as required by statute.

## II. *FACTS AND PROCEEDINGS*

In 1988 the Alaska legislature enacted comprehensive aquatic farm legislation. Ch. 145, SLA 1988 (the Act). The law authorized the farming of aquatic plants and shellfish in the waters of Alaska and requires DNR to regulate these activities.

Section 1 of the Act states that the Act's policy is to "encourage the establishment and responsible growth of an aquatic farming industry in the state" and "allocat[e] ... aquatic farming sites ... with full consideration of established and ongoing activities in an area." Ch. 145 § 1, SLA 1988. The statutes relevant to this case are AS 38.05.855 and .856. They detail procedures for DNR to follow in identifying farm districts and sites and issuing individual permits.

In 1988 DNR requested nominations from the public and interested state and federal agencies for aquatic farm districts as contemplated by AS 38.05.855(a). The request was published in local newspapers throughout the state. An informal advisory group was established to assist DNR in implementing the statute.[1] Former DNR Director Gary Gustafson, the administrator in charge of implementing the Act, stated that "[t]he high num-

ber of nominations and the variations in ideas regarding the areas to be nominated underscored the complexity of determining whether a particular aquatic farm would be appropriate for a particular location."

In the Southcentral Region, DNR received a total of 574 nominations. Eighty-eight areas were nominated for aquatic farming, seventy-nine areas were proposed for exclusion from aquatic farming, and DNR received 412 items of information indicating recreation areas, fishing areas and anchorages. In the Southeast Region DNR received a total of 1031 nominations. One hundred sixty-two areas were nominated for aquatic farming, 369 areas were proposed for exclusion and 500 items of information were received by DNR indicating recreation areas, fishing areas and anchorages. A number of persons, many of whom were landowners or fishermen in regions where DNR considered issuing permits, protested having aquatic farms on particular sites.

Gustafson averred that DNR implemented the Act in the following manner:

5. .... DNR staff and participants in an informal advisory group established to assist DNR in implementing the statute, were mindful of existing area land use plans as the primary planning and management vehicle for these state lands.

6. DNR staff and myself reasoned that unless an area plan or an important policy or factual rationale justified closing a particular area of the state to aquatic farming, an area would be opened for the filing of applications and a response to particularized inquiry would be undertaken later under AS 38.05.855(c) and (d) in evaluating any application actually filed. In general, I found no compelling legal, policy or factual basis for closing any particular area of the state to applications.

7. Pursuant to AS 38.05.855(a) ... in late January or early February of 1989, I identified aquatic farm districts in Alaska within which applications might be filed for establishing and operating aquatic farms. I have been informed that staff at DNR

---

1. The advisory group included representatives of conservation organizations, commercial fisher-

men, state and federal agencies, and the public.

have been unable to locate a formal, written memorialization of that decision; however, I did, in fact, make the decision, and it was communicated to DNR staff.

8. In accordance with AS 38.05.855(a), I identified five districts in Southcentral Alaska and six districts in Southeastern Alaska which roughly corresponded to regions covered by DNR area plans. I identified no districts in other regions because little interest was demonstrated by the public in those areas and conditions were generally regarded as unsuitable for aquatic farming. It was my view, and that of the Department in general, that since area plans govern the classification and primary uses for which lands are managed by DNR, I would identify districts roughly matching regional areas. It was our intent that aquatic farm permit applications would then be reviewed in a manner that would ensure compatibility with existing area plans.

9. Kachemak Bay is within one of the five districts I identified in Southcentral Alaska.

10. After identifying the aquatic farm districts, I informed members of my staff responsible for implementing this program of my decision. My decision was implemented and the public was informed of the identification of districts through maps made available at DNR regional offices together with aquatic farm applications.

When DNR published notice of district openings in the fall of 1989, it stated that it would accept applications for aquatic farms in Kachemak Bay during a sixty-day period in 1990. The districts drawn in the Southeast and Southcentral Regions of Alaska corresponded to areas delineated in DNR's general land use plans.

DNR explained its actions in the following way:

By identifying districts and providing a 60–day period of time each year for accepting applications for sites in each district, the Department could more easily process applications by "batch" and coordinate appli-

cation review and separate agency permitting by [other agencies for required review in areas such as district and state coastal zoning plans].... For these reasons the former Director of the Division of Land ... decided that there was no compelling reason to close any area of the state for purposes of *filing* aquatic farm applications for consideration by the Department.[2]

(Emphasis in original.)

Robert Halpin, Brian Miller, and George Donart applied for aquatic farm permits in Kachemak Bay during the 1992 applications period. In October DNR issued preliminary findings recommending approval of the applications. After public notice and hearings, DNR issued a final decision approving the permits.

In February 1993 individuals with interests in the Kachemak Bay area incorporated Kachemak Bay Watch (KBW) as a nonprofit corporation. KBW appealed DNR's approval of the Kachemak permits. After additional public hearings and comment, DNR affirmed its decision to issue the permits. KBW appealed to the Commissioner, who denied the appeal.

KBW appealed to the superior court. The superior court sustained DNR, finding that the agency satisfied the Act's requirements for drawing districts, the districting was not subject to the Administrative Procedure Act (APA), and DNR's regulations were sufficient under the Act. The superior court also rejected KBW's claim of public interest litigant status and awarded DNR attorney's fees and costs.

KBW appeals, arguing: (1) DNR failed to formally designate districts for aquatic farmsites as required by AS 38.05.855(a); (2) DNR failed to formally designate districts pursuant to the APA; (3) DNR made an impermissible *de facto* decision to open all coastal areas of Southeast and Southcentral Alaska to applications; (4) DNR regulation 11 AAC 63.050 is legally insufficient under

---

**2.** A Natural Resource Manager for DNR affied that the advisory group also did not "favor[ ] a blanket prohibition of aquatic farming in any

district or any component part being considered."

AS 38.05.856(e); and (5) KBW is a public interest litigant.

## III. *DISCUSSION*

### A. *Standard of Review*

■ We independently review the merits of an administrative determination. No deference is given to the superior court's decision when that court acts as an intermediate court of appeal. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

■ We have four standards of review for appeals of administrative decisions. For questions of law not involving agency expertise, we apply the "substitution of judgment" standard. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992); *Kjarstad v. State*, 703 P.2d 1167, 1170 (Alaska 1985). For questions of law involving agency expertise, we apply the "reasonable basis" test. *Rose v. Commercial Fisheries Entry Comm'n*, 647 P.2d 154, 161 (Alaska 1982). The "reasonable and not arbitrary" standard is applied to administrative regulations. *Handley*, 838 P.2d at 1233. The "substantial evidence" test is applied to questions of fact. *Id.*

■ We review the superior court's determination of KBW's public interest litigant status and the award of attorney's fees only for abuse of discretion. *Citizens Coalition for Tort Reform, Inc. v. McAlpine*, 810 P.2d 162, 171 (Alaska 1991).

### B. *Applicable Law*

Alaska Statute 38.05.855 provides:

(a) The commissioner shall identify districts in the state within which sites may be selected for the establishment and operation of aquatic farms and related hatcheries required to have a permit under AS 16.40.100.

(b) The commissioner shall schedule at least one 60–day period each year during which a person may submit an application that identifies a site in a district for which the person wishes to be issued a permit under AS 38.05.856.

(c) Based on applications received under (b) of this section, and after consultation with the commissioner of fish and game and the commissioner of environmental conservation, the commissioner shall make a preliminary written finding under AS 38.05.035(e) that proposes sites in each district for which permits may be issued under 38.05.856.

(d) After notice is given under AS 38.05.945 and a hearing is held under AS 38.05.946(b), the commissioner shall issue a final written finding under AS 38.05.035(e) that identifies sites in each district for which permits shall be issued under AS 38.05.856 and that specifies conditions and limitations for the development of each site.

Alaska Statutes 38.05.945 and .946(b) require DNR to give notice and hold hearings before making site proposals. AS 38.05.946(b) states, "The commissioner shall hold a public hearing in each district identified under AS 38.05.855 within 30 days after giving notice of a preliminary finding under AS 38.05.035(e) and 38.05.855(c) concerning sites for aquatic farms and related hatcheries."

Alaska Statute 38.05.856 provides for the issuance of permits. It states in part:

(a) The commissioner may issue a tideland or land use permit for the establishment and operation of an aquatic farm and related hatchery operations....

. . . .

(c) Before issuing or renewing a permit under this section, the commissioner shall consider all relevant testimony submitted under this section or AS 38.05.946(b). The commissioner may deny the application for issuance or renewal for good cause, but shall provide the applicant with written findings that explain the reason for the denial.

. . . .

(e) The commissioner shall adopt regulations establishing criteria for the approval or denial of permits under this section and for limiting the number of sites for which permits may be issued in an area in order to protect the environment and natu-

ral resources of the area. The regulations must provide for the consideration of upland management policies and whether the proposed use of a site is compatible with the traditional and existing use of the area in which the site is located.

## C. District Identification

■ Alaska Statute 38.05.855(a) requires DNR to "identify districts in the state within which sites may be selected" for aquatic farming. KBW argues that DNR failed to implement this first requirement. Whether DNR properly "identified districts" turns on competing interpretations of the statute. We conclude that DNR failed to comply with the provisions of AS 38.05.855(a) when identifying farm districts.

DNR argues that AS 38.05.855(a) is a procedural rather than substantive measure. It likens "the district identification requirement to a management tool to smooth the aquatic farm application paper flow." Under this reasoning, districts are drawn for "administrative convenience;" classifying incoming applications by geographic areas enables DNR to process numerous applications for the same area at one time. This interpretation of AS 38.05.855(a) relegates any substantive decisions about which areas are suitable for aquatic farming to a post-districting stage. DNR concludes that its publication of maps

of farm districts in Southcentral and Southeast Alaska satisfied the requirements of AS 38.05.855(a).

By contrast, KBW argues that the Act requires a four-step process (sections (a)-(d)) and that each step is a distinct decision. It reasons that the first step, district identification, requires a formal determination of what areas may appropriately be devoted to aquatic farming.

### 1. The language of the Act

Alaska Statute 38.05.855 uses the term "identify" to direct action that shall be taken by the Commissioner regarding districts and sites. AS 38.05.855(a), (d). Identification suggests a conscious act and determination.

■ DNR simply designated all of Southcentral and Southeast Alaska as districts. It failed to explicitly close any portion of these regions to aquatic farming. In reality it relied on existing general land use plans, which were created without consideration of aquatic farming, and delegated specifying which areas are suitable for farming to the permitting stage. Further, DNR chose to open all of both regions despite extensive testimony from various groups that particular areas should be closed to farming.[3] There is no documentary proof that this decision was reached after weighing and analyzing the evidence presented.[4]

---

3. DNR created an informal commission and appropriately solicited public and expert responses to the creation of aquatic farm districts. It received recommendations to leave over 400 sites closed to farming, yet the Director decided to open all areas, testifying by affidavit that no reason existed for the closure of any area. The record provides no explanation of how he reached this conclusion despite the nominations for closure of 79 areas in the Southcentral Region and 369 areas in the Southeast Region. DNR and Gustafson indicate that the decision to leave both regions entirely open was based on administrative efficiency.

4. "Where, as here, the question is as to the merits of agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion." *North Slope Borough v. LeResche*, 581 P.2d 1112, 1115 (Alaska 1978). Where an agency fails to consider an important factor, its decision is regarded as arbitrary. *Southeast Alaska Conservation Council v. State*, 665 P.2d 544, 548–49 (Alaska 1983).

In *Southeast Alaska Conservation*, this court stated:

[T]he role of the court is to
ensure that the agency "has given reasoned discretion to all the material facts and issues." The court exercises this aspect of its supervisory role with particular vigilance if it "becomes aware, especially from a combination of danger signals, that the agency has not really taken a 'hard look' at the salient problems and has not genuinely engaged in reasoned decision making."
. . . .
A decisional document, done carefully and in good faith, serves several salutary purposes. It facilitates judicial review by demonstrating those factors which were considered.... And it tends to restrain agencies from acting beyond the bounds of their jurisdiction.

*Id.* at 549 (citations and footnote omitted).

"[I]f a statute requires reasoned decisions, and the legislature has not expressly or by implication limited judicial authority to decide how to review administrative action, courts may and

District identification pursuant to AS 38.05.855(a) is both a procedural and substantive step. It has a procedural aspect because it allows DNR to categorize applications for permits according to geographic region. It also involves an important substantive policy decision because it requires DNR to "identify" districts within which farmsites "may be selected." The "may be selected" language indicates that DNR must distinguish between those areas of Alaska that will be open to farming and those that will be closed. DNR cannot reasonably make this decision without analyzing facts relevant to the suitability of various areas of Alaska to aquatic farming. By simply publishing maps of aquatic farm districts based on general land use plans, DNR neglected its responsibilities under AS 38.05.855(a).

### 2. *The need for a substantive districting decision*

DNR's actions implicate concerns similar to those raised in *Thane Neighborhood Ass'n v. City & Borough of Juneau*, 922 P.2d 901 (Alaska 1996). In *Thane Neighborhood*, the City and Borough of Juneau Planning Commission (Commission) used a phased approach in approving a large mine permit. First, the Commission withheld approval of certain parts of the project pending further information and approved the remainder of the project. Second, the Commission approved the permit but required further information on certain matters. Third, the Commission imposed a condition that the permittee obtain necessary permits from other agencies. *Thane Neighborhood*, 922 P.2d at 905. We concluded that the Commission should not have granted the mine permit while excepting major portions of the project. *Id.* at 909. Phasing was disfavored because (1) "it can result in disregard of the cumulative potential environmental impacts of a project," and (2) "permit conditions may not serve as a substitute for an initial prepermitting analysis that can be conducted with reasonably obtainable information." *Id.*

at 908 (citing *Kuitsarak Corp. v. Swope*, 870 P.2d 387, 396 n. 27 & 30 (Alaska 1994); *Trustees for Alaska v. State, Dep't of Natural Resources*, 851 P.2d 1340, 1344, 1346 (Alaska 1993); *Trustees for Alaska v. Gorsuch*, 835 P.2d 1239, 1246 (Alaska 1992)).

The reasoning of *Thane Neighborhood* applies to this case. DNR identified five districts in Southcentral Alaska and six in Southeast Alaska. In contravention of AS 38.05.855, it made no other district identifications and no site identifications. In addition, it used existing DNR area plans to delineate the districts, rather than develop a plan specific to aquatic farming. DNR pursued no other steps in the farmsite identification process, leaving all remaining determinations to the permitting stage.

Such action effectively merged the provisions of AS 38.05.855, which were then merged with AS 38.05.856's rules for evaluating permit applications. The statutes mandate identification of districts pursuant to subsection 855(a) and a subsequent determination of appropriate site locations under subsections 855(b)-(d) and 856(e). Because sites are a subset of districts, siting decisions can be made only once the district is identified.

In short, DNR collapsed the identification and permit processes. As with phasing, such combination of the statutes precludes any analysis of the overall impact on the affected areas; it limits in-depth consideration of possible negative consequences to the evaluation individual permit applications. The result is that cumulative potential environmental and economic impacts cannot be weighed. *See Gorsuch*, 835 P.2d at 1246 ("DNR may not ignore cumulative effects of mining and related support facilities by unreasonably restricting its jurisdiction or by permitting facilities separately.... If DNR determines that the cumulative impact is problematic, the problems must be resolved before the initial permit is approved.").

should require agencies to explain their actions." *Ship Creek Hydraulic Syndicate v. State*, 685 P.2d 715, 718 (Alaska 1984). In this case, we are presented with no decisional document indicating how the Director arrived at the conclusion that no reason exists to close any areas in the state to aquatic farming, despite the fact the agency received over 400 area closure requests. We are left with no basis to determine that the Director's decision was not arbitrary.

We construe AS 38.05.855 as requiring DNR to make discrete decisions about the appropriateness of aquatic farming in certain areas before considering any individual permit applications. While the enabling legislation seeks to promote aquatic farming,[5] it also protects other important interests by placing statutory limits on development. To comply with the statute, DNR must identify districts and then consider, pursuant to agency consultations, preliminary findings, notice, hearings, and final written findings, what sites within those districts can be developed for aquatic farming. AS 38.05.855(c)-(d). Only once DNR examines the needs of the communities and the state, identifies districts and sites based on those needs, and imposes appropriate restrictions can the agency consider issuing individual permits pursuant to AS 38.05.856. Alaska Statute 38.05.856(e) states that "the commissioner shall adopt regulations ... [that provide] for the consideration of ... whether the proposed use of a site is compatible with the traditional and existing use of the area in which the site is located." Logically, such regulations can be implemented only after sites have been identified.[6]

In *Trustees for Alaska v. State, Department of Natural Resources*, while examining a state decision to issue oil and gas leases for compliance with coastal management regulations, we emphasized the dangers of limiting environmental impact review to the individual permitting stage:

[D]eferring a careful and detailed look at particularized geophysical hazards to later stages of the development process, as DNR evidently intends, entails certain practical risks. First ... [it] means that particularized geophysical hazards will be considered on a lease-site-by-lease-site basis. This may tend to mask appreciation of any cumulative environmental threat that would otherwise be apparent if DNR began with a detailed and comprehensive identification of those hazards. Second, ... the more segmented an assessment of environmental hazards, the greater the risk that prior permits will compel DNR to approve later, environmentally unsound permits.

851 P.2d at 1344. Both concerns are raised by DNR's implementation of the aquatic farm legislation. Restricting the review and investigation process to individual applications precludes cumulative impact analysis. In addition, because "allocation of aquatic farming sites [is to] be made with full consideration of established and ongoing activities in an area," DNR's segmented process, by only considering the past use of the relevant limited area, would have resulted in a tendency toward reissuance. Ch. 145 § b(2), SLA 1988.

3. *DNR is not required to comply with the APA in identifying the districts.*

 KBW also argues [7] that the identification of aquatic farm districts under the

---

5. The Findings state:

(a) The legislature finds that
(1) aquatic farming in the state would
 (A) provide a consistent source of quality food;
 (B) provide new jobs;
 (C) increase state exports;
 (D) create new business opportunities; and
 (E) increase the stability and diversity of the state's economy; and
(2) development of aquatic farming in the state would increase the availability of fresh seafood to Alaskans and would strengthen the competitiveness of Alaska seafood in the world marketplace by broadening the diversity of products and providing year-round supplies of premium quality seafood.
Ch. 145 § 1, SLA 1988.

6. In other words, the statutes contemplate a three-step process: (1) Pre-application: DNR solicits and receives public comment on what areas should be closed because of competing uses or otherwise. Based on this information and cumulative environmental impact analysis, DNR designates districts (the total area suitable for aquatic farming). (2) After districts have been designated, DNR accepts applications for sites within the districts. Based on the applications and the mandates of sections 855(c)-(d) and 856(e), DNR proposes sites. (3) Finally, pursuant to public hearings and comment and other requirements of sections 856(c), (d), and (e), DNR issues permits.

7. KBW argues that DNR's decision to accept applications in Southeast and Southcentral Alaska should be reversed on the ground that the Commissioner failed to make the districting decision in accordance with APA rules for the adoption of regulations. As set forth above, we hold that DNR did not properly identify the districts

Act constitutes a regulation subject to the APA.[8] The APA establishes the minimum procedural requirements for the adoption of administrative regulations. *See* AS 44.62.280. Whether the agency action is a regulation is a question of law that does not involve agency expertise.

We have repeatedly rejected agencies' attempts to avoid the strictures of the APA by claiming their actions were general guidelines or policy statements, rather than regulations. *See Gilbert v. State, Dep't of Fish & Game,* 803 P.2d 391, 395–97 (Alaska 1990); *Kenai Peninsula Fisherman's Co–op. v. State,* 628 P.2d 897, 904–06 (Alaska 1981). Nonetheless, while the definition of "regulation" under the APA is broad, it does not encompass every agency practice or decision. Indicia of a "regulation" include: (1) whether the practice implements, interprets or makes specific the law enforced or administered by the state agency, and (2) whether the practice affects the public or is used by the agency in dealing with the public. *Kodiak Seafood Processors Ass'n v. State,* 900 P.2d 1191, 1197 (Alaska 1995); *Gilbert,* 803 P.2d at 396.

In *Batterton v. Marshall,* 648 F.2d 694, 707 (D.C.Cir.1980), the Court of Appeals for the District of Columbia observed:

> [M]any merely internal agency practices affect parties outside the agency—often in significant ways.... [E]ven office hours ... necessarily require conformity on the part of the public. A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of the

parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.

(Footnotes and internal quotations omitted.) The *Batterton* court also stated, "The essential purpose of according ... notice and comment opportunities is to reinforce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Id.* at 703.

DNR's district identification decision affects the public in the limited manner discussed in *Batterton.* Whether DNR's identification of aquatic farm districts constituted a regulation as that term is defined in the APA presents a close question. As noted above, districting pursuant to AS 38.05.855(a) has both procedural and substantive aspects. However, district identification does not alter the rights of the parties, does not deprive any party of a fair opportunity for public participation, embodies no finding as to a particular application and does not establish criteria by which particular applications should be evaluated.

"Agencies often make discretionary decisions not requiring formal procedures." *Olson v. State, Dep't of Natural Resources,* 799 P.2d 289, 292 (Alaska 1990). "We have described an agency's discretionary decision that does not require formal procedures as 'quasi-executive[.]' " *Kodiak Seafood Processors,* 900 P.2d at 1197. We review such decisions only for an abuse of discretion. *Id.*

DNR regularly makes decisions that are quasi-executive in nature and do not constitute regulation under the APA even when

---

as required under AS 38.05.855 and reverse DNR's actions on that ground. We address the APA issue here to provide direction to DNR and the superior court on remand of the district identification process.

8. The APA defines "regulation" as

> every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; "regulation" does not include a form prescribed by a

state agency or instructions relating to the use of the form, but this provision is not a limitation upon a requirement that a regulation be adopted under this chapter when one is needed to implement the law under which the form is issued; "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretive bulletins," "interpretations" and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a regulation, regardless of its name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public[.] AS 44.62.640(a)(3).

one or more indices of a regulation are present. *See Olson,* 799 P.2d at 292. For instance, the Commissioner does not identify by regulation those lands made available for oil and gas leases, mineral leases, or timber sales. *See* AS 38.05.180(b), AS 38.05.135–175, and AS 38.05.115. The legislature's assignment of a task to an agency, such as the identification of districts at issue here, invariably involves the exercise of agency discretion.

District identification is the first step in a lengthy, detailed public process of determining what aquatic farm will be allowed in what location. The legislature's established procedures under the Act do not include requiring the identification of districts by regulation. By contrast, in 1988 the legislature expressly required the Commissioner to "adopt regulations establishing criteria for the approval or denial of [aquatic farm] permits," thereby addressing the last stage of the process. AS

38.05.865(e). No similar express requirement for regulations exists for the district identification process and we have no reason to believe such a requirement was intended. *See Croft v. Pan Alaska Trucking, Inc.,* 820 P.2d 1064, 1066 (Alaska 1991) ("where certain things are designated in a statute 'all omissions should be understood as exclusions'") (citation omitted).

The superior court therefore correctly determined that the identification of aquatic farm districts under AS 38.05.855(a) does not constitute a regulation under the APA.

### D. *The Regulations*

■ Alaska Statute 38.05.856 governs the procedures for issuing aquatic farming permits. In keeping with its directives the Department promulgated the regulations codified at 11 AAC 63.050.[9]

9. 11 AAC 63.050 provides in part:
 (b) The commissioner will prepare a preliminary best interest finding that proposes sites for which permits may be issued.... The finding will consider both advantages and disadvantages of the proposal. Criteria that will be considered in the finding include:
 (1) whether the Department of Fish and Game considers the proposed aquatic farm or hatchery to meet the criteria of AS 16.40.105;
 (2) whether the Department of Environmental Conservation determines that the proposed aquatic farmsite is protected from pollution from adjacent floating and upland support activities, to ensure product wholesomeness, and that effective pollution control measures can be implemented to protect land and water at the site from pollution caused by the proposed aquatic farm or hatchery;
 (3) whether the coordinating state agency proposes to find the proposed aquatic farm or hatchery consistent with the Alaska Coastal Management Program;
 (4) whether aquatic farming is compatible with official land management policies applicable to the proposed aquatic farmsite and nearby upland, including legislative or congressional designations such as parks or wilderness areas and adopted federal, state, and local land use plans, land classifications, and zoning;
 (5) whether aquatic farming conflicts with existing uses, or with pending uses, as that term is defined in 11 AAC 63.900, of the site and of nearby land, whether or not the nearby land is in state ownership, including consideration of
 (A) impacts on nearby communities or residential land;
 (B) traditional and existing uses of the site, including commercial fishing, sport fishing, subsistence activities, use as a primary anchorage, navigation, seaplane landing area, recreation, sightseeing, and tourism; consideration of this criterion will, in the commissioner's discretion, be combined with a traditional use finding if such a finding is required by AS 38.05.830;
 (C) historic and cultural resources;
 (D) commercial or industrial facilities, such as log transfer facilities, salmon hatcheries, seafood processing plants, or harbor development, that would be incompatible with aquatic farming;
 (6) how public access to and along public waters, and the upland owner's right of reasonable access to tidewater, will be ensured by reserving easements under 11 AAC 53 or by other means; if upland access to the water is limited to a specific point by topography, existing improvements, or other factors, the commissioner will ensure that aquatic farming facilities do not obstruct water access to that point;
 (7) how the interests served by the public trust doctrine, specifically the public's right to use navigable waters and the land beneath them for navigation, commerce, fishing, and other purposes, will be protected;
 (8) whether special permit provisions or other measures are needed to mitigate identified conflicts; for this purpose the commissioner will consult guidelines set out in an applicable land use plan, zoning ordinance, or coastal management program, or, if no such document or guidelines exist or if it would otherwise be appropriate, will consult the guidelines set out on pp. 80—85 of the final 1988 Etolin Island Area Mariculture Pilot Project;

KBW argues that these regulations do not satisfy the requirements of AS 38.05.856(e) because they "in effect authorize the exercise of unfettered administrative discretion in approving or denying a farmsite permit." This argument is without merit.

■ Our review of regulations adopted by an agency in its quasi-legislative capacity, if enacted according to APA procedures and within the discretion vested by the legislature, is limited to determining: (1) whether the regulation is consistent with the statute and reasonably necessary to its purposes, and (2) whether the regulation is reasonable and not arbitrary. *Kenai Peninsula Fisherman's Co-op.*, 628 P.2d at 906.

DNR's permitting regulations are consistent with the statute's directives. They provide substantial guidance to the agency in exercising its judgment and applying its expertise to accomplish the goals established by the legislature.

### E. *Public Interest Litigant Status*

■ We have articulated four criteria for determining whether a party qualifies as a public interest litigant: (1) is the case designed to effectuate strong public policies?; (2) if the plaintiff succeeds will numerous people receive benefits from the lawsuit?; (3) can only a private party have been expected to bring the suit?; and (4) would the purported public interest litigant have sufficient economic incentive to file suit even if the action involved only narrow issues lacking general importance? *McAlpine*, 810 at 171 (citing *Anchorage Daily News v. Anchorage School Dist.*, 803 P.2d 402, 404 (Alaska 1990)). The party claiming public interest litigant status carries the burden of satisfying all four criteria. *Id.*

The superior court ruled that KBW was not a public interest litigant because "its principals had a substantial personal economic interest in the outcome of the litigation. This interest, and not the interests of the public at large, was the motivation for [KBW's] action."

■ In deciding whether a party's interest in a suit can be characterized as economic, the determinative question is "whether the [litigant] is motivated primarily by private as opposed to public interests." *Sisters of Providence v. Dep't of Health & Social Servs.*, 648 P.2d 970, 979 n. 27 (Alaska 1982). We have said that the fourth criterion in the analysis

> may be expressed as whether the litigant claiming public interest status would have had sufficient economic incentive to bring the lawsuit even if it involved only narrow issues lacking general public importance. Such a litigant is less apt than a party lacking this incentive to be deterred from bringing a good faith claim by the prospect of an adverse award of attorney's fees.

*Id.* at 979–80 (citation omitted). A court must weigh the individual facts of the case to determine if the litigant's primary motivation for filing suit was economic. *Eyak Traditional Elders Council v. Sherstone, Inc.*, 904 P.2d 420, 426 (Alaska 1995).

KBW argues that it meets the fourth criterion because a successful suit would not have resulted in a monetary recovery for the corporation or its individual members, and the litigation was not motivated by an economic incentive. KBW contends that it seeks to invalidate the aquatic farm permits because they would interfere with traditional uses of the bay by local residents, set netters, commercial fishermen and tour operators. KBW is a non-profit corporation, with Articles of

(9) other significant social, economic, and environmental effects of the proposed aquatic farming.

(c) In general, the commissioner will not grant aquatic farmsite permits that would encumber more than a third of the surface area estimated to exist at mean lower low water of a bay, bight, or cove, unless the commissioner finds that (1) it is in the state's best interest to concentrate permits in one such bay, bight, or cove so as to keep other specified water bodies

completely unencumbered, (2) the cumulative impacts will not be excessive, and (3) the upland owner will retain a right of reasonable access to tidewater. Such a finding will be included in the best interest finding, as well as in the land use plan if one is being prepared. 11 AAC 63.050(b)-(c).

We specifically note that nothing in this opinion is intended to abrogate the provisions of 11 AAC 63.050(c).

Incorporation that identify its broad policy concerns as preventing detrimental environmental impact from aquatic farming in the Kachemak Area.

To succeed on appeal, KBW must show that the superior court abused its discretion in making its public interest litigant determination. *McAlpine*, 810 P.2d at 171. Evidence was presented that three KBW directors had sufficient economic incentive to bring the lawsuit. Two directors owned property in the area and expressed concern that property values would decrease as a result of DNR's actions. The third director operates a commercial kayak guiding and fishing charter and acknowledged that aquatic farming in the area could interfere with his business.

KBW did not provide the superior court with detailed information about its membership and their interests. KBW bore the burden of providing evidence sufficient for the court to determine its public interest litigant status. It failed to meet this burden. The superior court reasonably based its decision on the economic incentives of the KBW members about whom it had more detailed information. *See Municipality of Anchorage v. Citizens for Representative Governance*, 880 P.2d 1058, 1061 (Alaska 1994) ("When a group does not reveal the identity of its members, a court may not be able to determine the group's public interest status.").

We therefore hold that the superior court did not abuse its discretion in ruling that KBW is not a public interest litigant.

## IV. CONCLUSION

DNR failed to properly identify districts for aquatic farming, in violation of AS 38.05.855. We REVERSE on this ground.[10] We therefore invalidate DNR's decision to accept applications for aquatic farming throughout Southeast and Southcentral Alaska and remand this case for implementation of AS 38.05.855 in conformity with this opinion. We affirm the superior court's rulings that (1) the APA does not govern the district identification process; (2) DNR's permitting

regulations are sufficient; and (3) KBW is not a public interest litigant.

MATTHEWS, J., not participating.

---

10. This holding requires that the superior court's award of costs and attorney's fees against KBW be VACATED and costs and attorney's fees be redetermined on remand.